**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAN 3 1 2003

| | |
|---|---|
| JEFFREY T. BELL<br>1515 Jefferson Davis Highway<br>#504<br>Arlington, VA 22202,<br><br>               Plaintiff,<br><br>        v.<br><br>JOHN D. ASHCROFT<br>Attorney General of the United States<br>United States Department of Justice<br>10th Street & Constitution Avenue, N.W.<br>Washington, DC 20530,<br><br>        and<br><br>ROBERT S. MUELLER, III<br>Director, Federal Bureau of Investigation<br>United States Department of Justice<br>935 Pennsylvania Avenue, N.W.<br>Washington, DC 20535-0001,<br><br>               Defendants. | Civil Action No. _____<br><br>CASE NUMBER 1:03CV00163<br>JUDGE: John D. Bates<br>DECK TYPE: Employment Discrimination<br>DATE STAMP: 01/31/2003<br><br>**JURY ACTION** |

COMPLAINT FOR RELIEF FROM DISABILITY DISCRIMINATION
AND REPRISAL IN FEDERAL EMPLOYMENT

1. This is a complaint by a federal employee for relief from disability discrimination, harassment based on disability, and reprisal committed by his employer, a federal government agency.

## Jurisdiction and Venue

2.      This court has jurisdiction pursuant to Title VI and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d et seq., and § 2000e-16; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq.; and 28 U.S.C. § 1331.

3.      Venue is proper in this court because the U.S. Department of Justice and the Federal Bureau of Investigation, where plaintiff is employed, where all of the personnel decisions here alleged to be discriminatory or retaliatory and where all or most of the acts alleged to be discriminatory or retaliatory occurred, are located in the District of Columbia.

## Parties

4.      Plaintiff, Jeffrey Thomas Bell, is a citizen of the United States, who has been employed by the United States Department of Justice and the Federal Bureau of Investigation since 1984. Plaintiff suffers from a condition known as Tourette Syndrome.

5.      Defendant John D. Ashcroft is the Attorney General of the United States, and as such is the head of the United States Department of Justice, the Executive Agency of which the Federal Bureau of Investigation ("FBI") is presently a part. He is sued in his official capacity only, and on behalf of his predecessors, successors, agents and employees, including past and present supervisors of Plaintiff Jeffrey Bell. Defendant Robert S. Mueller is the Director of the FBI, and as such is responsible for overseeing the operations of that Bureau. He is sued in his official capacity only, and on behalf of his predecessors, successors, agents, and employees, including past and present supervisors of Plaintiff Jeffrey Bell.

## Statement of Facts

6. By his formal education and training, Plaintiff is an accomplished professional photographer. He holds a Bachelors of Science degree in professional photography from the Rochester Institute of Technology.

7. Plaintiff began his employment with the FBI in 1984. From 1984 until 1991, he worked in the Bureau's Photographic Processing Unit. In the spring of 1991, he was transferred from the Photographic Processing Unit to the Special Photographic Unit's (SPU) Forensic Studio where his duties were those of a "shooting photographer," i.e. he was employed to take photographs for use in investigation, prosecutorial, and other law enforcement activities of the FBI.

8. Photographers in the FBI's SPU take photographs for use in a variety of the FBI's activities, and are deployed to crime scenes and investigative sights both in the United States and abroad to assist FBI agents in functions that include investigations of espionage and terrorism, forensic matters, security and foreign counterintelligence matters, crises and emergency response operations, and surveillance.

9. During the relevant time period, Forensic Studio photographers were also regularly deployed to teach classes to FBI agents, support employees, and other law enforcement personnel on topics such as crime scene photography.

10. While employed as a professional photographer in the SPU between the Spring of 1991 and the Fall of 2000, Plaintiff was deployed on many important and often high-profile photography assignments. He established a reputation for excellence as a shooting photographer, and received numerous formal and informal commendations and awards for his work.

11. Prior to the Spring of 1996, moreover, Plaintiff's duties included being in the "chain of command" in the Forensic Studio; that is, Plaintiff had supervisory authority over certain aspects of the studio's operations. In addition, Plaintiff participated in teaching classes in crime scene photography as part of an ERT (Evidence Response Team) program.

12. Plaintiff's duties in the Forensic Studio, particularly his photographic assignments requiring travel away from the Washington, D.C. area, involved frequent overtime work, for which Plaintiff was compensated in addition to his regular salary. For example, during the three year period from 1997 through 1999, Plaintiff's salary was supplemented by an average of more than $5,800.00 per year, attributable to overtime pay offered by his position as a shooting photographer.

13. Since his childhood, Plaintiff has suffered from a neurological disorder known as Tourette Syndrome (TS). TS is caused by a biochemical imbalance within the chemistry of the brain.

14. Typical symptoms of TS include involuntary, multiple motor and vocalization activities. These motor and vocalization activities are commonly referred to as "tics." Motor tics are repetitive in nature and involve irregular movements of various body parts such as eye blinking, head twisting, facial movements and shoulder shrugging. Vocal tics may include snorting, sniffing, repetitive coughing, throat clearing or the shouting of actual words. Some TS patients utter profane or otherwise antisocial words.

15. Other behaviors and symptoms associated with TS include difficulties with impulse control (which can result in aggressive, defiant, or angry behaviors, or other socially inappropriate acts), sleep disorders, learning disabilities (such as reading and

4

writing difficulties), Obsessive Compulsive Disorder (OCD) or obsessive personality, and Attention Deficit Disorder with or without Hyperactivity (ADD or ADHD).

16. Plaintiff suffers from typical symptoms of TS, including motor tics and occasional involuntary vocalization, as well as sleep disorders, occasional impulse control difficulties, and certain obsessive compulsive personality traits. These symptoms interfere with Plaintiff's engagement in activities of daily life, including communication and social interactions. Moreover, Plaintiff's involuntary motor activities include hand movements which make it difficult to hold a camera steady for purposes of taking photographs, or to perform other work requiring fine-motor skills. Nevertheless, through a combination of medication, and practice at his profession and his photographic art, Plaintiff has been and remains able to adjust for and/or control his "tics" sufficiently to accomplish high-quality photography work.

17. Plaintiff has at all times relevant to this complaint been under the treatment of a medical doctor to control the effects of his TS. His treatment includes regular medication as prescribed by his physician.

18. The medication Plaintiff is required to take to control his TS symptoms has potentially adverse side effects, including emotional effects such as increased irritability, anger and mood swings. Plaintiff has occasionally suffered from these side effects, which have required adjustments of his medication.

19. Plaintiff has been straightforward and open with his colleagues and superiors regarding his TS condition. Throughout his employment with the FBI, he has never attempted to hide or conceal the fact that he suffers from TS. As a result, most or all of the persons with whom Plaintiff interacts and works at the FBI are, and were at all

5

times pertinent to the allegations of this Complaint, aware of the fact that he suffers from TS.

20. In the Spring of 1995, Plaintiff experienced an adverse reaction to his medication, resulting in a period of greater irritability and difficulty in controlling his temper than he usually experiences.

21. During this period, an incident occurred that impacted on Plaintiff's workplace conduct. While Plaintiff was driving to work, an unknown individual driving a truck had followed him (on the road and even into the parking lot at Plaintiff's workplace), making rude gestures, mimicking and ridiculing Plaintiff's tics. When Plaintiff arrived at work, a coworker persisted in pressuring Plaintiff to explain why he appeared distressed, despite Plaintiff's repeated assertions that the source of his distress was something he considered private and embarrassing, and did not wish to speak about. Eventually, in response to his coworker's relentless questioning, Plaintiff engaged in a verbal altercation with his coworker which resulted in Plaintiff and his coworker receiving oral reprimands from their Unit Chief.

22. Subsequent to this incident, Plaintiff consulted his physician and learned that his increased irritability in previous weeks and difficulty in controlling his temper on this occasion were likely to have been caused by the high dosage of medication he had been taking for his TS symptoms. Plaintiff's physician thereupon gradually decreased his medication dosage, and these side effects substantially subsided. While this decrease in medication dosage diminished Plaintiff's emotional side effects, it also resulted in increased physical symptoms of TS, i.e. tics, that Plaintiff has had to endure and control.

23. After the incident described in paragraph 21, Plaintiff provided his Unit Chief with a written communication from his doctor, explaining the emotional and personality-related side effects of the medication Plaintiff is required to take. Nevertheless, ever since that incident, Plaintiff's supervisors and many of his coworkers have regarded him as a "problem" personality, with inadequate emotional control.

24. Due to this perception, Plaintiff's supervisors, in the years following the incident described above in paragraph 21, consistently blamed Plaintiff for any conflict or disagreement that arose between him and his coworkers.

25. In 1996, Wayne Feyerherm was promoted to the position of a Supervisory Photographer with supervisory authority over the operations of the Forensic Studio and its staff. Mr. Feyerherm therefore became Plaintiff's immediate supervisor. During the ensuing years, Mr. Feyerherm consistently exhibited intolerance towards Plaintiff and the manifestations of his disability, and harassed and discriminated against Plaintiff in numerous ways, including but not limited to, the following:

   a. By removing Plaintiff from the chain of command in the Forensic Studio, and creating circumstances where Plaintiff was effectively under the supervision of employees who were less experienced, less skilled than, and junior to, himself.

   b. By making a purposeful effort to restrict Plaintiff from appearing in public as a representative of the SPU and the FBI, including by limiting Plaintiff's teaching assignments and formulating pretextual reasons for doing so.

   c. By recommending against, and thereby preventing, Plaintiff's receipt of awards, including monetary awards for team efforts in which Plaintiff had actively participated and for which all other active members of the team were given awards. This occurred, specifically, with respect to awards given members of FBI photographic teams that were deployed at the Oklahoma City bombing site and in Kosovo.

d. By unfairly reprimanding and criticizing Plaintiff in circumstances that did not warrant such supervisory reaction, for example where Plaintiff had forwarded to his supervisors a complimentary e-mail from a fellow employee thanking Plaintiff for his assistance in solving a problem, and where Plaintiff successfully fixed malfunctioning equipment.

e. By speaking to Plaintiff in derogatory terms, including by accusing Plaintiff of having "emotional problems" and by referring to Plaintiff as an "idiot."

f. By restricting Plaintiff's opportunities for high-visibility projects within the FBI and the Justice Department; for example, by inaccurately representing that Plaintiff was "too busy" to respond to requests for portrait photography of upper-level officials in the Bureau and the Department.

g. By increasingly restricting Plaintiff's active shooting assignments and opportunities for travel outside the Washington, D.C. area and outside the United States in connection with such assignments.

h. By formulating pretextual reasons to exclude Plaintiff from active shooting assignments.

i. By repeatedly and unnecessarily soliciting commentary from Plaintiff's coworkers regarding Plaintiff's personal behavior, including on at least one occasion during a staff meeting, and including by telephoning employees at their homes after business hours.

j. By attempting to remove Plaintiff from active shooting assignments altogether, notwithstanding Plaintiff's exceptional and well-recognized abilities in that area.

k. By excluding Plaintiff from meetings, attended by the other senior photographers in the Forensic Studio, at which matters impacting on distribution of work assignments and other aspects of studio operations were discussed.

26. Mr. Feyerherm did not engage in conduct and activities of the type described above in paragraph 23 with respect to the non-disabled staff under his supervision.

27. On August 25, 2000, Plaintiff first contacted an EEO counselor to discuss Mr. Feyerherm's attitude towards and treatment of Plaintiff.

8

28.     In late August, 2000, Plaintiff also confided in a coworker, Mr. Danny Keen, that he was considering initiating EEO action as a result of his treatment by Mr. Feyerherm.

29.     On September 5, 2000, at the suggestion of the EEO counselor with whom he had conferred, Plaintiff spoke with Section Chief Tod Hildebrand about his difficulties with Mr. Feyerherm, including Plaintiff's perception of Mr. Feyerherm's intolerance of Plaintiff's disability. Mr. Hildebrand represented that he would speak to Mr. Feyerherm and the Unit Chief, Athena Varounis, about the substance of his discussion with Bell and about Tourette Syndrome.

30.     Subsequently, on or about September 21, 2000, a meeting to discuss Plaintiff was held and attended by Mr. Feyerherm, Ms. Varounis, Larry Wallery and Danny Keen, to whom Plaintiff had confided his intent to explore EEO options in dealing with his employment situation. At that meeting, Plaintiff's supervisors, Mr. Feyerherm and Ms. Varounis, determined that they would remove Plaintiff from his duties as a shooting photographer and assign him to a different subunit, supervised by Mr. Wallery, as a replacement for a departing employee whose principal duties were cleaning photographic equipment and inspecting equipment being exchanged by FBI field offices.

31.     Mr. Bell was officially informed at a meeting on October 5, 2000 with, among others, Mr. Feyerherm and Ms. Varounis, that he was to be reassigned to the Field Support sub-unit of the SPU as of October 8, 2000, and that he was unlikely ever to be returned to his former duties in the Forensic Studio.

32.     Plaintiff was informed by Mr. Larry Wallery, Plaintiff's new supervisor in the Field Support subunit to which he was being reassigned, that this reassignment to

different duties was intended to give him a "less stressful working environment" before he "left" the FBI.

33.  Since October 8, 2000, Plaintiff has been assigned to the Field Support subunit of the SPU, where his duties have consisted primarily of inventory, cleaning, inspecting and repairing equipment, and other "field support" services that do not include photography assignments. Plaintiff has not been assigned any teaching or photography duties during that time, with the exception of one limited teaching assignment and one photographic assignment that was necessitated by the medical leave of another employee. Plaintiff received each of these assignments at a time when there appeared to be some possibility that Plaintiff would agree to a negotiated settlement of his EEO complaint.

34.  Since being assigned to the Field Support subunit, Plaintiff has been denied opportunities to utilize and further develop his professional photographic skills, as well as opportunities for supervisory and teaching experience that he would have been afforded had he remained in the Forensic Studio. As a consequence of his reassignment, he has also been denied the supplementary income associated with overtime work he would have had the opportunity to perform in his previous subunit assignment. Because he has been denied assignments commensurate with and appropriate to his experience, training and special talents, Plaintiff's visibility and opportunities for professional advancement have been substantially diminished.

35.  In a sworn statement executed in connection with investigation of Mr. Bell's EEO complaint, Plaintiff's then-current supervisor in the Field Support subunit, Larry Wallery, expressly verified that Plaintiff's present duty assignment does not involve much opportunity to deal with the public, does not lend itself to traveling or teaching

10

assignments, does not afford Plaintiff supervisory experience or opportunity, and does not involve work for which Plaintiff is likely to ever receive any type of award. Mr. Wallery also specifically expressed his view that Mr. Bell is "under-tasked in light of his abilities" and "should be doing photography work" instead of his presently assigned duties.

36. Other coworkers of Plaintiff in the SPU who were interviewed and gave sworn statements in the course of investigation of his EEO complaint stated that Plaintiff has been placed in what is normally an "entry-level" position, from which employees are ordinarily reassigned after gaining experience, and that this reassignment, although technically a "lateral" personnel move, was comparable to reassigning a company's former Chief Executive to the supply room. More than one of Plaintiff's coworkers expressed the view that this reassignment must have been intended as some kind of "punishment" for Mr. Bell.

37. Since Plaintiff's reassignment to the Field Support subunit of the SPU, supervisory personnel of the FBI have continued to discriminate and retaliate against him by conduct that includes, but is not limited to, refusing to assign him photographic duties, disparaging projects in which Plaintiff has been involved, and providing superior equipment and opportunities for advancement to non-disabled employees with less seniority, experience, and professional expertise in photography than Bell.

38. As a result of the above-described circumstances and actions by supervisory personnel of the FBI, Plaintiff has suffered substantial injury to his professional development, reputation, and opportunities for advancement, increased medical expenses and other financial harm, humiliation, and emotional distress of a

11

severity that has aggravated and exacerbated Plaintiff's TS symptoms and need for medications to control those symptoms.

## Exhaustion of Administrative Remedies

39. Subsequent to consultations with an EEO counselor on August 25, 2000, Plaintiff contacted an EEO counselor at the FBI on October 5, 2000 regarding his contention of discrimination and retaliation by his supervisors, specifically in connection with his reassignment to the Field Support subunit.

40. Plaintiff filed a formal complaint of discrimination on November 3, 2000, alleging unlawful discrimination and retaliation by his supervisors.

41. Plaintiff's EEO complaint was subsequently amended by a further submission on November 11, 2000, clarifying the nature of Plaintiff's claims in somewhat greater detail.

42. The FBI acknowledged receipt of Plaintiff's complaint by letter of November 21, 2000, and the FBI's Office of EEO Affairs proceeded to investigate the complaint.

43. By letter and enclosure of August 23, 2001, Plaintiff was notified of the completion of the EEO Investigation and provided a copy of the report thereof.

44. By letter of September 26, 2001, Plaintiff requested a final decision from the Department of Justice on his complaint of discrimination and retaliation, pursuant to federal regulations at 29 C.F.R. § 1614.110(b).

45. By letter of October 23, 2001, Plaintiff was notified that his complaint had been forwarded to the Justice Department's Complaint Adjudication Officer ("CAO") for a final agency decision.

46.     Since October, 2001, Plaintiff, his counsel, and representatives of the FBI have engaged in negotiations in regard to potential settlement of Mr. Bell's complaint, and Plaintiff has refrained from taking further formal action in the hope that a mutually acceptable resolution of his complaint might be successfully negotiated. It has become clear, however, that no administrative settlement will be agreed upon between the parties.

47.     No final decision on Plaintiff's complaint has been rendered; and well more than 180 days have passed since Plaintiff filed his Complaint, and since he requested a final agency decision thereon.

48.     Plaintiff has suffered discrimination, retaliation, and failure to adequately accommodate his disability, in violation of Sections 501 and 504 of the Rehabilitation Act, 29 U.S.C. §§ 791 and 794; and Plaintiff has exhausted his administrative remedies.

## Statement of Claims

### Count I
### (Discrimination on the Basis of Disability)

49.     Plaintiff realleges paragraphs 1 to 48 of this complaint as fully set forth herein.

50.     By criticizing, reprimanding, and insulting Plaintiff without provocation, by disparaging projects in which he has participated, by removing Plaintiff from his former role in the chain of command of the Forensic Studio, by monitoring Plaintiff's behavior more closely than that of other employees and regularly inviting coworkers to comment adversely upon his conduct, by excluding him from meetings in which other similarly situated and similarly senior Forensic Studio photographers participated, by restricting Plaintiff's appearance in public on behalf of the FBI, and by restricting and ultimately denying Plaintiff opportunities for teaching experience, supervisory functions,

travel, photographic shooting work, and other responsible and/or high-visibility assignments, including by transferring him out of the Forensic Studio of the SPU and reassigning him to the Field Support subunit, defendants and/or their agents harassed and unlawfully discriminated against him based on his disability, creating a hostile work environment.

51.  By denying Plaintiff awards that were warranted by his professional performance and achievements, reassigning Plaintiff to a subunit of the SPU where his duties were not commensurate with his demonstrated abilities and level of experience and skill, and where he was denied opportunities for professional development, professional advancement, and overtime pay, and by refusing to reassess or alter this assignment during the last three years, defendants, through Plaintiff's supervisors, further discriminated against him based upon his disability, and continue to engage in such unlawful discrimination.

52.  As a result of defendants' and/or their agents' conduct, Plaintiff has suffered humiliation, emotional distress, aggravation of the symptoms of his disability, increased medical expenses and other financial detriment, and damage to his professional reputation and career.

## Count II
## (Retaliation)

53.  Plaintiff realleges paragraphs 1 to 48 of this complaint as though they were fully set forth herein.

54.  By reassigning Plaintiff from the Forensic Studio of the SPU to its Field Support subunit following Plaintiff's consultation with an EEO counselor regarding his treatment by supervisors and his intimation that he was considering EEO action,

14

defendants and/or their agents retaliated against Plaintiff for having engaged in statutorily protected EEO activity.

55.  By failing to transfer Plaintiff back to the Forensic Studio where he would be assigned duties as a shooting photographer that are commensurate with and appropriate to his experience and level of professional expertise, defendants and/or their agents have continuously retaliated against Plaintiff since October, 2000 for having engaged in the statutorily protected activity of resort to the EEO process, and continue to so retaliate against him up to and including the present time.

56.  As a result of defendants' and/or their agents' conduct, Plaintiff has suffered and continues to suffer humiliation, severe emotional distress, aggravation of the symptoms of his disability, increased medical expenses and other financial detriment, and damage to his professional reputation, development, and opportunities for advancement.

## Demand for Relief

Wherefore, Plaintiff prays that this Court:

a)  issue an Order finding that defendants violated the Rehabilitation Act and the Civil Rights Act by discriminating against him based on his disability, and retaliating against him for engaging in statutorily protected EEO activity;

b)  issue an order (1) requiring that Plaintiff be reassigned to the Forensic Studio of the SPU and be assigned duties appropriate to his experience, training, seniority in the SPU, and level of technical ability as a photographer, including teaching assignments, supervisory functions with respect to junior personnel, and shooting photography assignments in the United States and abroad commensurate with those given other, nondisabled employees of similar seniority, experience, and skill; (2) prohibiting

15

defendants from removing Plaintiff from his duties as a shooting photographer except for deficiencies in his performance of photographic assignments, or upon the request or with the written agreement of Plaintiff; (3) requiring defendants to provide appropriate training to Plaintiff's coworkers and supervisors on the topic of Tourette Syndrome and its symptoms and manifestations; and (4) requiring defendants to accommodate his disability by tolerating, instead of punishing, the symptoms and manifestations of TS from which he suffers, including the side-effects of its treatment;

c) award Plaintiff his reasonable costs and attorneys' fees associated with this action and with Plaintiff's pursuit of EEO remedies at the administrative level;

d) award Plaintiff compensatory damages in the amount of $225,000; and

e) Order such other relief as is just and proper in this case.

### Jury Demand

Plaintiff demands a trial by jury.

Respectfully submitted

*Edith S. Marshall*
EDITH S. MARSHALL
(D.C. Bar No. 328310)

*Justin R. Hunter*
JUSTIN R. HUNTER
(D.C. Bar No. 472082)
POWERS PYLES SUTTER
 & VERVILLE, P.C.
1875 Eye Street, N.W.
Twelfth Floor
Washington, DC 20006-5409
(202) 466-6550