## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**JEFFREY T. BELL,**

    **Plaintiff,**

      **v.**

**ALBERTO GONZALES,**[1] **Attorney General, U.S. Department of Justice, <u>et al.</u>,**

    **Defendants.**

---

**Civil Action No. 03-163 (JDB)**

## <u>MEMORANDUM OPINION</u>

Plaintiff, a photographer with the Federal Bureau of Investigation ("FBI"), brings this action against defendants the Attorney General and the Director of the FBI alleging discrimination on the basis of disability and retaliation in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 <u>et seq.</u>, and Title VII of the Civil Rights Act, 42 U.S.C. § 2000d <u>et seq.</u>, and § 2000e-16.  Defendants have submitted a motion for partial dismissal on the disability discrimination claims and for summary judgment on the remainder of the claims. Plaintiff has moved for partial summary judgment, seeking judgment as a matter of law on the disability discrimination claims.  For the reasons explained below, the Court grants summary judgment in favor of defendants on the discrimination claims, but denies summary judgment on the retaliation claim.

---

[1]  Pursuant to Fed. R. Civ. P. 25(d)(1), Alberto Gonzales, the current Attorney General, is substituted as the named lead defendant.

# BACKGROUND[2]

Plaintiff's alleged disability is Tourette's Syndrome ("TS"), a neurological disorder characterized by multiple involuntary movements and uncontrollable vocalizations called tics. TS may also result in additional behavioral or emotional problems, such as obsessive-compulsive tendencies, emotional lability, irritability, impulsivity, and aggression.  Plaintiff has experienced the behavioral characteristics of TS at various points in time.[3]

Plaintiff has been employed by the FBI as a photographer since 1984.  Since 1991, he has worked as a Science & Technical Photographer ("S&T") in the Special Photographic Unit ("SPU"), which includes two subunits -- the Forensics Studio and the Field Support Subunit. From 1991 to October of 2000, plaintiff was assigned to the Forensics Studio, where he was responsible for performing complex and sometimes high profile assignments, including

---

[2]  The facts summarized in this section are not in dispute, except where noted.  The parties disagree about the materiality of some of the facts, but the relevance is explained in later sections of this opinion.  For ease of reference, the Court will refer to the exhibits attached to defendants' motion for partial dismissal and for summary judgment and plaintiff's motion for partial summary judgment as "Defs.' Exhibits" and "Pl.'s Exhibits," respectively, and to the exhibits attached to the parties' reply briefs as "Defs.' Supplemental Exhibits" and "Pl.'s Supplemental Exhibits."

[3]  A fuller description of Tourette's Syndrome is set forth in publications of the National Institutes of Health and the Tourette's Syndrome Association.  See Pl.'s Exhibits 1, 3. Defendants dispute whether these additional behavioral and emotional symptoms are part of TS, but for purposes of ruling on whether plaintiff is disabled, the Court considers these symptoms.

Alternatively, defendants assert that a separate and distinct disorder known as "TS Plus" is at issue.  However, the testimony cited by defendants -- the deposition of plaintiff's expert witness, Dr. Anthony Rostain -- does not indicate that there is a distinct "TS Plus" disorder. Persons with TS experience its symptoms with varying degrees of severity, and some experience behavioral symptoms beyond the typical motor and vocal tics.  Dr. Rostain stated that he uses the convention "TS Plus" to refer to persons with the more complex behavioral symptoms of TS. See Rostain Depo. at 152-54 (Defs.' Supp. Exhibit 1-C).

photographing crime scenes in Kosovo, Tanzania, and Oklahoma City.  In 1994, plaintiff began seeking treatment from a neurologist, Dr. Susan Caulkins, in an effort to control his TS symptoms.   He began taking Clonadine to control his tics, and he increased his dosage in 1995, which he believes led to increased irritability.   In 1995, Dr. Caulkins sent a letter to plaintiff's management explaining the side effects of the medicine.   For the next three years, plaintiff was not given travel assignments, was not included in managerial meetings affecting the Forensics Studio, and was not given opportunities to serve in informal supervisory capacities (such as "acting" chief of the Studio).  In 1996, Wayne Feyerherm became chief of the Forensics Studio – and hence plaintiff's direct supervisor.  Plaintiff and Feyerherm had repeated conflicts in the office stemming from what plaintiff perceived to be unfair treatment, including criticisms, reprimands, and deprivation of desirable assignments.  Nonetheless, plaintiff consistently earned superior performance appraisals, and from 1993 to 2000 he was consistently rated "exceptional" in the critical element of technical ability.

In January of 1998, Athena Varounis became the SPU Chief.  Plaintiff voiced his concern to her about not being deployed on travel assignments, and Varounis instructed Feyerherm to allow plaintiff to travel.  In March of 1999, plaintiff was promoted to a GS-13 level in the S&T Photographer position, the highest grade for the position.

On December 14, 1999, plaintiff was arrested for solicitation of prostitution while on business travel for the FBI.  At this time, Varounis placed plaintiff under a travel restriction for a period of one year (until December 2000), while an investigation by the Office of Professional Responsibility ("OPR") was conducted.  On December 6, 2000, OPR issued an adjudication letter finding plaintiff in violation of agency regulations based on the conduct underlying the

arrest, and, <u>inter alia</u>, placed plaintiff on probation for one year.  This resulted in a continuation of the travel restriction until December 2001.

During this same time frame, plaintiff remained unhappy with the manner in which he was being treated within SPU, primarily due to the ongoing conflict between plaintiff and Feyerherm.  On or about August 25, 2000, plaintiff met with an EEO counselor, Ben Holliday, to discuss the difficulties he was experiencing in the Forensics Studio, but did not file an administrative complaint at that time.  The EEO counselor suggested that plaintiff's problems were due to a "personality conflict" with Feyerherm, and advised plaintiff to meet with Tod Hildebrand, a supervisor further up the chain-of-command.  Plaintiff then met with Hildebrand on September 5 to discuss his situation.

On October 5, 2000, Varounis notified plaintiff that he would be laterally reassigned to the Field Support Subunit, effective October 8, 2000.  Varounis' stated reason for the reassignment was two-fold:  first, plaintiff was unhappy working for Feyerherm, and she believed the reassignment would "make him happy"; and second, there was a need for another staff person to work in the Field Support Subunit because of the backlog in camera repair and cleanings.  Plaintiff's recent arrest and the ongoing OPR investigation were unrelated to the decision to reassign plaintiff.  Plaintiff and the EEO counselor notified Varounis that he objected to the reassignment, but Varounis did not change her decision.  During this same time (August to October of 2000), the SPU was preparing to hire another S&T Photographer, and once the hiring decision was made, Varounis assigned the new photographer to the Forensics Studio.[4]  On

---

[4]  The vacancy announcement for this position was published on or about August 24, 2000.  Pl.'s Exhibit 25.

November 3, 2000, plaintiff filed an EEO administrative complaint alleging that the

reassignment constituted (1) discrimination based on disability and (2) retaliation for contacting

the EEO counselor on August 25, 2000.

Plaintiff proceeded to work in the Field Support Subunit for three years, from October 8,

2000, to September 22, 2003.  He maintained his job title and GS-13 grade, but his duties

changed and the opportunities to work paid overtime were diminished.  Plaintiff was assigned

primarily to camera cleaning work and taking inventory, and had no opportunity to do

photography in the field with the exception of one occasion in September 2003.

In November 2001, Larry Sparks replaced Varounis as the Unit Chief of SPU.  On March

22, 2002, he issued a memorandum to institute a policy of rotating photographers between SPU

subunits, stating that all photographers in the subunits were "not given the same opportunity to

maintain photography skills described in their performance standards."  Pl.'s Exhibit 35.  After

this change in policy, plaintiff was allowed to take on the one photography assignment noted

above.  Plaintiff also had two other occasions to do work beyond camera cleaning and inventory:

a training assignment in June 2002, and installation of a "concealment" in August 2002.[5]  Id.  In

May 2003, Feyerherm retired and left the Forensics Studio.  On September 22, 2003, plaintiff

was rotated back to the Forensics Studio.

## STANDARD OF REVIEW

The Court has considered matters outside of the pleadings to rule on that part of

defendants' motion requesting dismissal under Fed. R. Civ. P. 12(b)(6) and thus treats it as a

---

[5] Concealments involve placing a camera in a commonplace object to enable the subject
to be photographed without the subject's knowledge.

motion for summary judgment, together with the rest of defendants' motion.  Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

**<u>DISCUSSION</u>**

I.     **Exhaustion of Administrative Remedies**

Defendants initially move to dismiss all claims involving discrete acts of discrimination,

with the exception of the lateral transfer to the Field Support Subunit, on the ground that plaintiff

failed to initiate contact with an EEO counselor within 45 days of those acts.  Pursuant to 29

C.F.R. § 1614.105(a)(1), prior to filing an administrative complaint, an aggrieved person must

contact an EEO counselor in order to try to informally resolve the matter, and must do so "within

45 days of the date of the matter alleged to be discriminatory, or in the case of a personnel action,

within 45 days of the action."[6]  Because plaintiff made his initial contact with the EEO counselor

on August 25, 2000, any claims based on discrete acts of discrimination occurring more than 45

days before that date -- that is, before July 10, 2000 -- are time-barred.  A party must file a charge

within the Title VII limitations period for each discrete act of discrimination alleged or lose the

ability to recover for it.  <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114-15 (2002).

 An assertion that the discrete acts constitute a "continuing violation" or a series of related

violations will not save a claim that falls outside of the limitations period.  <u>Id.</u>

The Court agrees that, with the exception of the lateral transfer, plaintiff cannot bring a

claim for discrete acts of discrimination.  Plaintiff's amended complaint alleges that commencing

in the spring of 1995 and "during the ensuing years," defendants, primarily through Feyerherm,

treated him less favorably than his non-disabled co-workers, including treating him as a "problem

personality," blaming him for workplace conflict, excluding him from the informal chain of

---

[6]  The agency may extend the 45-day time limit under certain circumstances not relevant
here.  <u>See</u> 29 C.F.R. § 1614.105(a)(2).

command and staff meetings, restricting his travel and teaching assignments, restricting his high

visibility projects, unfairly reprimanding and criticizing him, and speaking to plaintiff in

derogatory terms.  Amended Compl.  ¶¶ 23-29.  Plaintiff has conceded that these events are not

"independently actionable at this time."  Pl.'s Mot. for Partial Summ. J. and Opp. to Defs.' Mot. at

43.

However, plaintiff appears to contend that these events, including the lateral

reassignment, collectively rose to the level of a hostile work environment and should be

actionable as such.[7]  The Supreme Court has distinguished a claim regarding hostile work

environment from discrete acts of discrimination:  "A hostile work environment claim is

composed of a series of separate acts that collectively constitute one 'unlawful employment

practice.' . . . Provided that an act contributing to the claim occurs within the filing period, the

entire period of the hostile environment may be considered by a court for the purposes of

determining liability."  Morgan, 536 U.S. at 117.  Here, the lateral reassignment occurred on

October 5, 2000, and plaintiff contacted the EEO counselor on the same date, thus bringing one

of the claims contributing to the alleged hostile work environment within the 45-day limitation

period.  Although plaintiff did not specify a "hostile work environment" claim as such in either of

---

[7]  The Court assumes, without deciding, that the Rehabilitation Act includes a cause of action for hostile work environment.  See Kuraner v. Mineta, 2001 WL 936369 (D.C. Cir. July 10, 2001) (unpublished opinion indicating that this Circuit has not decided the issue, but suggesting there may be a basis for it).  A number of circuits have held that the ADA and Rehabilitation Act do create a cause of action for hostile work environment, while others have avoided deciding whether the claim exists.  See Leavitt v. Wal-Mart Stores, Inc., 2003 WL 22016287, *5 n.3 (1st Cir. Aug. 27, 2003) (collecting cases).  Although the terms of 29 U.S.C. § 794(a) could conceivably encompass such a claim, the Court need not address that issue to resolve the pending motions because, as discussed in Section II(C), it has determined that, applying the standards for hostile work environment developed under Title VII, the undisputed facts fail to support such a claim.

his EEO contacts, a Title VII lawsuit includes the claims that are "like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations." Jones v. Billington, 12 F. Supp. 2d 1, 7 (D.D.C. 1997) (citations and quotations omitted) (holding that exhaustion requirement was satisfied even though hostile work environment was not included in formal EEO charge because it related to the conduct alleged in the charge), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998).  Plaintiff's hostile work environment claim appears to be based on substantially the same conduct discussed with the EEO counselor and alleged in his EEO administrative complaint.  Thus, plaintiff has satisfied the exhaustion requirement for the hostile work environment claim.  Accordingly, the Court grants defendants' motion to dismiss the claims alleging discrete acts of discrimination as violations of law, with the exception of the lateral transfer, and denies the motion to the extent it seeks to dismiss plaintiff's hostile work environment claim.

## II.    Discrimination Based on Disability

### A.    Legal Framework

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability."  29 U.S.C. § 794(a).[8]  To establish a prima facie case of prohibited employment discrimination under the Act based on disparate treatment, a plaintiff must show:  (1) that he is a disabled person with the meaning of the Act; (2) that he is qualified to perform the essential

---

[8]  The legal standards set forth in Title VII have been incorporated into the Rehabilitation Act.  29 U.S.C. § 794a(a); see generally Barth v. Gelb, 2 F.3d 1180, 1184 (D.C. Cir. 1993).  Thus, the familiar burdenshifting analysis developed under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) -- discussed in more detail in Section III on the retaliation claim --  applies.

functions of the job with or without reasonable accommodation; and (3) that he suffered an

adverse employment decision because of his disability.  Baker v. Potter, 294 F. Supp. 2d 33, 42

(D.D.C. 2003).  To establish a prima facie case of hostile work environment, a plaintiff must

demonstrate that:  (1) he is a member of a protected class; (2) he is subject to unwelcome

harassment; (3) the harassment was based on his protected status; (4) the harassment affected a

term, condition, or privilege of employment; and (5) the employer knew or should have known of

the harassment and failed to take action to prevent further harassment.  Jones v. Billington, 12 F.

Supp. 2d at 11.  Thus, for both claims, a key element is establishment of a disability covered by

the Act.  Defendants move for summary judgment on plaintiff's claims of disparate treatment and

hostile work environment on the grounds that plaintiff does not have a "disability" within the

meaning of the Act.

### B.       Definition of Disability -- Major Life Activity

A plaintiff is disabled under the Rehabilitation Act if he:  (1) has a physical or mental

impairment that substantially limits one or more major life activities; (2) has a record of such

impairment; or (3) has been regarded as having such an impairment.[9]  29 U.S.C. § 705(20)(B).

The Rehabilitation Act requires that the plaintiff must show an "impairment that substantially

---

[9]   The liability standards of the Rehabilitation Act and the Americans with Disabilities Act ("ADA") are the same in employment discrimination cases, and thus cases interpreting either are applicable in defining the term "disability" and otherwise determining liability. See 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the [ADA]."); see also Aka v. Washington Hosp. Ctr., 116 F.3d 876, 886 (D.C. Cir. 1997) (en banc) (recognizing that liability standards in the Rehabilitation Act and ADA are "fundamentally similar"); Branham v. Snow, 392 F.3d 896, 902 (7th Cir. 2004) (pursuant to 29 U.S.C. § 794(d) , "we refer to the provisions and standards of the ADA in determining whether there has been a violation of the Rehabilitation Act in this [employment] context").

limits one or more major life activities." Id.  As the Supreme Court has emphasized, "merely having an impairment does not make [an individual] disabled." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002).  A plaintiff also must demonstrate the impairment "substantially limits" a "major life activity." Id.  Defendants move for summary judgment on the ground that TS does not limit plaintiff in any "major life activity," and thus is not a "disability" within the meaning of the Act.   Alternatively, defendants argue that any such limitation is not "substantial."  Plaintiff opposes summary judgment on this issue on the ground that plaintiff is substantially limited in the activity of "interacting with others" and "interpersonal interaction." Plaintiff also argues that the major life activity of sleeping is at issue, which defendants contest. The Court addresses each of these issues in turn.[10]

### 1.       Interacting with Others

The primary focus of the parties' disagreement is on whether "interacting with others" (essentially the same activity as "interpersonal interaction") is a "major life activity."  This

---

[10]  Plaintiff asserts for the first time in a footnote to his reply brief that TS also has substantially limited his ability to carry out the major life activities of fine motor skills and driving.  Pl.'s Reply Mem. in Supp. of Mot. for Partial Summ. J. at 25 n.26.  Plaintiff makes no mention of this in his opposition brief, and the Court treats those issues as conceded.  See Pl.'s Mem. of Points & Authorities in Supp. of Mot. for Partial Summ. J. and in Opp. to Def.'s Mot. to Dismiss or, in the Alt., for Summ. J. 15-24 ("Pl.'s Mot. and Opp. Brief").  Plaintiff's failure to contest these issues in his opposition brief is significant because the issue of whether fine motor skills and driving should be recognized as "major life activities" is one of first impression in this Circuit, and indeed other cases have suggested they are not.  See Luttrell v. Certified Grocers Midwest, Inc., 2003 WL 22844239, *2 (N.D. Ill. 2003) (fine motor skill, in and of itself, is not a major life activity; disability analysis focuses on whether impairment of fine motor skills substantially limits a separate major life activity); Colwell v. Suffolk County Police Dept., 158 F.3d 635, 643 (2d Cir. 1998) (driving not a major life activity).  Such an issue should be presented through more than a passing reference in a footnote in a reply brief.  Yet plaintiff has made no legal argument in response to defendants' motion explaining why those activities should be recognized as "major life activities."

presents a question of law that has divided the Circuits.  Neither the ADA nor the Rehabilitation

Act defines "major life activity."  However, the Supreme Court has set forth general standards to

apply.  The term "major life activities" refers to "those activities that are of central importance to

daily life."  Toyota, 534 U.S. at 197.  Additionally, "these terms need to be interpreted strictly to

create a demanding standard for qualifying as disabled," to be consistent with the legislative

findings regarding the number of disabled Americans and the purposes that motivated enactment

of the ADA.  Id.

    The Second and Ninth Circuits have recognized "interacting with others" as a major life

activity under the ADA, reasoning that it is an "essential regular function," like walking and

breathing, and thus readily falls within the definition of "major life activity."  Jacques v.

DiMarzio, Inc., 386 F.3d 192, 202 (2d Cir. 2004); McAlindin v. County of San Diego, 192 F.3d

1226, 1234-35 (9th Cir. 1999).  The EEOC Compliance Manual also recognizes "interacting with

others" as a major life activity, though its persuasive value remains undetermined.[11]  See EEOC

Compliance Manual § 902.3(b) (2002).   In contrast, the First Circuit has held that the similar but

distinct activity of "getting along with others" is not a major life activity, reasoning that because

such an ability comes and goes, "triggered by vicissitudes of life which are normally stressful for

ordinary people," to conclude otherwise would be an unreasonable and unworkable reading of the

---

    [11]  The Supreme Court has noted that "no agency has been given authority to issue
regulations interpreting the term 'disability' in the ADA," but that the EEOC has nonetheless
issued such regulations.  Toyota, 534 U.S. at 194.  The Court assumed without deciding that the
regulations were reasonable, but refrained from deciding whether any deference would be due.
Id.  The Department of Justice regulations defining disability under the Rehabilitation Act (28
C.F.R. § 41.31(b)(2)) offer a non-exhaustive list of major life activities that does not include
"interacting with others," but that, too, sheds little light on this issue.  See also Bragdon v.
Abbott, 524 U.S. 624, 642 (1998) (noting the responsibility for implementing the Act is not
delegated to a single federal agency and leaving the question of deference unanswered).

ADA, requiring subjective judgments to be made about a person's ability, different in kind from walking and breathing.  See Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 15 (1st Cir. 1997) (reserving judgment on whether "a more narrowly defined concept going to essential attributes of human communication could, in a particular setting" be a major life activity); cf. Criado v. IBM Corp., 145 F.3d 437, 442 (1st Cir. 1998) (assuming without discussion that plaintiff's impaired ability to "relate to others" could be a basis for finding disability under ADA);[12] Rohan v. Network Presentations, LLC, 375 F.3d 266, 274 (4th Cir. 2004) ("We have expressed doubt on this point" - whether interacting with others is major life activity -- based on the concerns discussed in Soileau, but declining to resolve the issue).

The Court agrees with the Second and Ninth Circuits that "interacting with others" is a major life activity because, applying the standard in Toyota, it is an activity of "central importance to daily life."  The ability to interact with others is as basic and significant as the ability to learn or to work – two other activities widely recognized as major life activities and which themselves commonly involve the fundamental ability to interact with others.  See Lemire v. Silva, 104 F. Supp. 2d 80, 87 (D. Mass. 2000).  Thus, other district courts addressing the issue also have found "interacting with others," or "communicating with others," to be a major life activity.  Id.; Ray v. The Kroger Co., 264 F. Supp. 2d 1221, 1226 (S.D. Ga. 2003), aff'd on other grounds, 2003 WL 23018292 (11th Cir. Dec. 17, 2003); Purcell v. Pennsylvania Dep't of Corrections, 1998 WL 10236, *8 (E.D. Pa. 1998).

---

[12] Plaintiff asserts that the continued validity of Soileau is in question in light of the subsequent panel's decision in Criado.  However, in Criado the defendant did not contest whether "interacting with others" was a major life activity, but rather contested whether a "temporary" condition could be a covered disability.  Criado, 145 F.3d at 442.

However, the Court recognizes, as did the Second Circuit, that the test for determining whether this activity is "substantially limited" should be objective and strict to avoid creating an unbounded and subjective definition of disability (DiMarzio, 386 F.3d at 202-203), and, equally importantly, to be faithful to the Supreme Court's admonition that the definition of disability must be interpreted strictly to create a "demanding standard" for the disabled consistent with the legislative findings and purpose of the enactment.  Toyota, 534 U.S. at 197 (cautioning against an expansive definition of disability that would be inconsistent with Congress's findings on the number of disabled persons covered by the ADA).  Thus, this Court adopts the reasoning of the Second Circuit in defining what constitutes a "substantial limitation" on the activity of interacting with others:

> a plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment severely limits the fundamental ability to communicate with others.  This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, *i.e.*, to initiate contact with other people and respond to them, or to go among other people – at the most basic level of these activities.  The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful.

DiMarzio, 386 F.3d at 203 (emphasis added).  Thus, communications marked by hostility, argumentativeness, or a cantankerous manner  – including ill humor, irritability, or a determination to disagree – are not sufficient to demonstrate a substantial limitation of the activity of interacting with others.  Id.  Those characteristics go to the subjective quality of the communication, rather than the core question whether the plaintiff has the ability to communicate and thus interact with others.

As in all assessments of "substantial limitation," moreover, the determination whether an individual is substantially limited in a major activity must be made on a case-by-case basis, rather than a categorical one based only on a medical diagnosis of the impairment. Toyota, 534 U.S. at 198. Congress clearly intended the existence of a disability to be determined by defining disability "with respect to an individual." Id. The requisite degree of the limitation is high. The impairment must "prevent or severely restrict" the individual in the major life activity at issue, and the impact must be "permanent or long term." Id.

With these standards in mind, the Court must determine whether plaintiff has raised a genuine issue of material fact as to whether he is "substantially limited" in the major life activity of interacting with others. Based on the record, the Court finds that he has not. With respect to his ability to communicate, plaintiff does not dispute the following statements in defendants' statement of material facts with respect to which there is no genuine dispute:

4.      [Plaintiff] was able to provide eight hours of understandable deposition testimony which was typical of his ability to speak.

5.      In the normal course of his work at the Bureau, [plaintiff] interacts with U.S. Attorneys, FBI Special Agents, other photographers, other forensic examiners, etc.

6.      [Plaintiff] has taught classes while working as an S&T Photographer.
        . . .

9.      [Plaintiff] operates his own photography business, where he specializes in taking portraits of actors, and for weddings. [Plaintiff] obtained work at a wedding from Mike Brooks, a friend at work.
        . . .

11.     [Plaintiff] meets with his clients regarding how they would like his work to look, and is able to negotiate transactions for his own business.

12.     [Plaintiff] is able to communicate on the telephone, do his own banking, and purchase his own groceries without assistance.

13.     [Plaintiff] has never hired anyone to assist him in communicating or interacting with others.

See Defs.' Statement of Material Facts With Respect to Which There is No Genuine Dispute at 4-5 ("Defs.' Statement"); Pl.'s Statement of Genuine Issues Under Rule 7.1 and Response to Defs.' Statement at 4-5.  Plaintiff describes a number of situations in which he has been unsuccessful socially and disadvantaged in his ability to interact with others as a result of TS:   his visible and audible tics cause some people to avoid or ridicule him, people often regard him as "strange," and co-workers have often misinterpreted his words, gestures, and behaviors as rude, dismissive, aggressive, nasty, and controlling. Pl.'s Mot. and Opp. Br. at 20-24.   Keeping his tics adequately under control takes considerable energy and effort on plaintiff's part; afterwards, he may need to be alone for one to three hours so that he can tic without restraint and, on occasion, he may need several days of solitude.  Id.  Although the challenges described by plaintiff are burdensome and may lead to inappropriate and unsuccessful social interactions, the undisputed facts support only one conclusion -- that plaintiff has the basic ability to communicate and interact with others in an objective mechanical sense.  The type of problems plaintiff describes in his interactions are the type of subjectively "inappropriate, ineffective, or unsuccessful" communications that are not encompassed by the basic definition of interacting with others.  See DiMarzio, 386 F.3d at 203.  Accordingly, the Court finds that the undisputed material facts establish that plaintiff is not "substantially limited" in the activity of "interacting with others."[13]

_____

[13]  The Court recognizes that the only other district court decision on whether TS "substantially limits" a person in the major life activity of interacting with others reached the

(continued...)

## 2.      Sleeping

Plaintiff contends briefly that TS nonetheless constitutes a disability because it limits

another major life activity -- sleeping.  Defendants respond that summary judgment on this issue

is appropriate because plaintiff has not come forward with evidence showing that he was

substantially limited in his ability to sleep.  Assuming without deciding that sleeping is a major

life activity,[14] the Court finds that plaintiff has failed to demonstrate that he was substantially

limited in his ability to sleep.  The Supreme Court has held that to be substantially limiting, an

"impairment's impact must  . . . be permanent or long term."  Toyota, 534 U.S. at 198.

Additionally, "if a person is taking measures to correct for, or mitigate, a physical or mental

impairment, the effects of those measures . . . must be taken into account when judging whether

--------

[13](...continued)
opposite conclusion, but notes that the case is based on a different factual record.  See Ray, 264
F. Supp. 2d at 1226 (holding that TS constituted a disability covered by the Act where plaintiff
suffered from coprolalia -- the uncontrollable frequent outbursts of profanity, vulgar words, and
racial slurs); cf. Purcell, 1998 WL 10236, *8 (finding the issue of "substantial limitation"
involved genuine issues of disputed facts to be determined at trial).  A decision by one court that
TS constitutes a disability under the Act is of little precedential value because of the
individualized nature of the inquiry.  "An individualized assessment of an impairment is
particularly necessary when the impairment is one whose symptoms vary widely from person to
person."  Toyota, 534 U.S. at 199.  By plaintiff's own account, the symptoms of TS vary widely.
Thus, there may very well be different holdings on whether TS is a disability under the Act
because of the different factual records presented by individual plaintiffs.

[14]   This Circuit has not addressed whether sleeping is a major life activity, but has
recognized that several circuits have held it is.  See Haynes v. Williams, 392 F.3d 478, 482 & n.3
(D.C. Cir. 2004) (citing Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir.
1998); EEOC v. Sara Lee Corp., 237 F.3d 349, 352-53 (4th Cir. 2001); McAlindin, 192 F.3d at
1234; Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999)).  However, reasons have also
been suggested for declining to recognize sleeping as a major life activity in and of itself.  See
Haynes, 392 F.3d at 485-86 (Williams, J., concurring) (reasoning that because "sleep needs vary
radically," "the only way to answer the question whether the impairment 'substantially' limit[s] [a
plaintiff's] sleep would be by reference to the effect on his waking 'life activities'" without
looking separately at the intermediate step of an impact on sleep).

that person is 'substantially limited' in a major life activity."  Sutton v. United Air Lines, Inc., 527

U.S. 471, 482 (1999).  Here, plaintiff's deposition testimony shows that the impact of TS on his

ability to sleep consists mainly of frequent wakings -- sometimes every hour on the hour,

sometimes every hour and half, other times every two hours.  Bell Depo. at 37, 42 (Defs.' Exhibit

1).  The sleep interruptions go through cycles where "it goes for a while, then comes away."  Id.

at 43.  Plaintiff cannot recall the severity of the sleep disturbances during the 1998-2000 time

frame, when most of the alleged discriminatory events occurred.  Id. at 43.  It became sufficiently

severe in January 2001 that plaintiff sought a doctor's treatment and began taking Paxil which

relieved the problem.  Id. at 35-40 (stating that medication initially enabled him to sleep six

hours).  By about May or June of 2001, plaintiff began developing a tolerance to the medicine

and started "waking up more."  Id.  His doctor suggested looking for the root cause, and although

plaintiff did not describe the course of action in his deposition, he stated that "I follow her plan

and what she tells me to do and usually it works itself out. . . . I never necessarily become

completely fixed, but I can improve on it."  Id. at 41.

    Accepting this testimony as true and drawing all reasonable inferences in plaintiff's favor,

the Court finds that there is insufficient evidence to support a finding that plaintiff is

substantially limited in the activity of sleeping.  For the three-year period leading up to plaintiff's

transfer to the Field Support Subunit, plaintiff cannot recall the severity of the sleep disturbances

and thus the record is devoid of evidence that a "substantial limitation" existed during this period.

To the extent the record does describe the limitations on plaintiff's ability to sleep, the sleep

interruptions appear to be variable, not permanent, and subject to extended periods of abatement

when plaintiff is taking medication and following the advice of his doctor.  Generally, temporary

impairments subject to abatement or control do not, under Toyota or Sutton, constitute disabilities under the ADA or Rehabilitation Act.  See Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 497-98 (10th Cir. 2000) (finding no substantial limitation where sleep problems are "mitigated, though not cured, by medication"); Pouliot v. Town of Fairfield, 226 F. Supp. 2d 233, 243 (D. Me. 2002) (episodic sleep disturbances that occurred over a period of years do not constitute substantial limitation on sleep).

Moreover, recognizing that "difficulty sleeping is extremely widespread," most circuits that have addressed the issue of substantial impairment in the context of sleeping require evidence that the plaintiff's sleep disturbances are worse than the quality of sleep of the general population.  See Sara Lee, 237 F.3d at 352; Colwell, 158 F.3d at 644; Pack, 166 F.3d at 1306. Plaintiff has made no showing that his sleep disturbances are any worse than that suffered by many in the general population.  Thus, summary judgment for defendants is appropriate on the issue of whether plaintiff is disabled because of the effect of TS on his ability to sleep.[15]

In summary, the undisputed material facts establish that plaintiff is not substantially limited in the major life activities of interacting with others or sleeping.  Accordingly, the Court enters summary judgment for defendants on Count One, including both the disparate treatment and hostile work environment claims.

---

[15]   Defendants also seek summary judgment on the independent ground that there is no causal link between plaintiff's sleep difficulties and his transfer to the Field Support Subunit because plaintiff's supervisors were not aware of his sleeping difficulties before the reassignment. Because of the uncertainty of the applicability of Crandall v. Paralyzed Veterans of America, 146 F.3d 894, 897 (D.C. Cir. 1998), where a defendant has knowledge of a plaintiff's disorder but not its impacts, the Court's decision does not rest on this ground.

C.        **Hostile Work Environment**

Even if plaintiff could establish that he is "disabled" within the meaning of the

Rehabilitation Act, summary judgment for defendants would still be appropriate because the

conduct complained of does not rise to the level of a hostile work environment.  The workplace

is "hostile" for purposes of Title VII (and thus the Rehabilitation Act) only when the offensive

conduct "permeates [the workplace] with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78

(1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  The key terms, then,

are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct rises

to an actionable hostile work environment.  Under Faragher v. Boca, 524 U.S. 775, 787-88

(1998), in order to determine whether a work environment is sufficiently hostile to be actionable,

a court should consider:  (1) the frequency of the discriminatory conduct; (2) the severity of the

conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether

the conduct reasonably interferes with the employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that
> Title VII does not become a "general civility code."  Properly applied, they will
> filter out complaints attacking "the ordinary tribulations of the workplace, such as
> the sporadic use of abusive language, gender-related jokes, and occasional
> teasing."

Id. at 787 (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175

(1992)); Clark County School Dist. v. Bredeen, 532 U.S. 268, 271 (2001) ("simple teasing,

offhand comments, and isolated incidents (unless extremely serious)" are insufficient).

As discussed above, plaintiff bases his claim of hostile work environment on a series of events dating from 1995 to about 2003.  Defendants, primarily through Feyerherm, allegedly treated plaintiff as a "problem personality," blamed him for workplace conflict, monitored his behavior more closely than that of other employees, excluded him from the informal chain of command and staff meetings, restricted his travel and teaching assignments, restricted his high visibility projects, reprimanded and criticized him, and spoke to him in derogatory terms (e.g., referring to plaintiff as having "emotional problems" and calling him an "idiot").  Amended Compl.  ¶¶ 23-29.  This culminated in the reassignment of plaintiff out of the Forensics Studio to the Field Support Subunit, where defendants allegedly continued to deny plaintiff opportunities for teaching experience, supervisory functions, travel, photographic shooting work, and/or other high visibility assignments.

Occasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile work environment.  See Sullivan-Obst v. Powell, 300 F. Supp. 2d 85, 97 (D.D.C. 2004) (holding that denial of a rescheduling request regarding training and failure to promote would not constitute hostile work environment); Davis v. Ashcroft, 2005 WL 120094, *15 (D.D.C. Jan. 21, 2005) (characterizing exclusion from consultations with management, denial of request for telephone, and partial loss of job duties as attacks on the "ordinary tribulations of the workplace").  Many of plaintiff's allegations fall in this category -- exclusion from the informal chain of command, close monitoring of his work, missed opportunities for teaching, travel, and high-profile assignments, and his reassignment to the Field Support Subunit.  They simply lack the "severity" that is required to establish a hostile work environment, as they cannot fairly be labeled abusive or offensive.

The sporadic use of abusive language also is insufficient to establish a hostile work environment, and, indeed, the language quoted by plaintiff falls far short of the level of abusiveness that courts in other cases have found inadequate to establish a hostile working environment.  See, e.g., Stewart v. Evans, 275 F.3d 1126, 1131, 1134-35 (D.C. Cir. 2002) (use of term "idiot" and other profanities inadequate where language was not pervasive).  Moreover, there is no evidence here of any physically threatening language.

Another factor to consider is that the alleged conduct consists of intermittent acts spread out over an eight-year period -- 1995 to 2003.  The "temporally diffuse" nature of the conduct further suggests the lack of a condition sufficiently pervasive to constitute a hostile work environment.  See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (holding that occurrence of alleged incidents intermittently over a seven-year period suggests the absence of a condition sufficiently "pervasive" to establish liability).

Finally, with respect to whether the conduct reasonably interferes with the employee's performance, plaintiff acknowledges that he received superior performance appraisals during this period and received an "exceptional" rating in the critical area of technical ability.  The ratings are a further indication that the level of alleged harassment did not rise to that of a hostile work environment.

Thus, considering the totality of the circumstances, the Court finds that, as a matter of law, the conduct alleged did not create an actionable hostile work environment.  For that reason as well, defendants' motion for summary judgment on this claim must be granted.

**III.**    **Retaliation**

**A.**    **Legal Framework**

Like the disability discrimination claim, a claim for retaliation also falls under the burden-shifting analysis of the McDonnell-Douglas framework.  To establish a prima facie case, a plaintiff must show:  "(1) that he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two."  Morgan v. Federal Home Loan Mortgage Corp., 328 F.3d 647, 651 (D.C. Cir. 2003) (internal quotations and citations omitted).  If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  The employer's burden, however, is merely one of production.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). The employer "need not persuade the court that it was actually motivated by the proffered reasons, but it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff."  Id.

If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  The plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' "  Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination."  Reeves, 530 U.S. at 147.  Thus, the trier of fact may also "consider the evidence establishing the plaintiff's prima facie case 'and

inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Id. at 143 (quoting Burdine, 450 U.S. at 255 n.10).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves, 530 U.S. at 148-49.

Although under McDonnell Douglas the "intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Id. at 143 (quoting Burdine, 450 U.S. at 253).  Once the defendant has proffered a legitimate non-discriminatory reason for its action, then, the question is whether that proffered reason is a pretext for discrimination or retaliation, and at this point the McDonnell Douglas shifting burdens framework disappears, the sole remaining issue is discrimination or retaliation vel non. Id. at 142-43.  At this stage, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003). Examination of that issue in this setting therefore requires consideration of all the relevant circumstances, including the strength of the prima facie case, any direct evidence of discrimination or retaliation, and any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination or retaliation). See, e.g., Reeves, 530 U.S. at 147-48; Lathram, 336 F.3d at 1089; Waterhouse v. District of Columbia, 298 F.3d 989, 993 (D.C. Cir. 2002); Aka, 156 F.3d at 1290.

### B.     Protected EEO Activity

Defendants first argue that summary judgment is appropriate because the evidence establishes that plaintiff did not engage in statutorily protected activity until after the reassignment decision.  Defendants argue that, although plaintiff met with an EEO counselor on August 25, 2000 -- prior to the reassignment -- that meeting does not qualify as protected activity because plaintiff did not indicate that he believed he was being discriminated against during that meeting.  Defendants appear to argue that meeting with an EEO counselor is only protected if a plaintiff demonstrates an intent to begin the EEO process and also makes a clear allegation of discrimination, citing Pauling v. Secretary of the Interior, 960 F. Supp. 793, 803 (S.D.N.Y. 1997), vacated on other grounds, 160 F.3d 133 (2d Cir. 1998), and Pueschel v. Veneman, 185 F. Supp. 2d 566, 569-70 (D. Md. 2002).

Plaintiff responds that any resort to EEO counseling qualifies as participating in the EEO remedial process and is thus protected activity.  Plaintiff also disputes defendants' characterization of the EEO counseling meeting, pointing to evidence indicating that he voiced his suspicions of discrimination at the meeting, and that he did not make specific allegations of discrimination because he did not know whether TS was a covered disability.  See Bell Decl. ¶¶ 21-22 (Pl.'s Exhibit 5); Bell Depo. at 69-70 (Pl.'s Supp. Exhibit 9); Bell EEO Statement to EEO Investigator at 18-19 (Pl.'s Exhibit 8, Tab 9).  The EEO counselor stated that the situation sounded more like a personality conflict than an EEO matter, and advised plaintiff to meet with a supervisor further up the chain-of-command.  EEO Counselor Notes (Pl.'s Exhibit 8, Tab 3). Plaintiff then met with Hildebrand on September 5, 2000.  Plaintiff discussed the conflicts

regarding Feyerherm and whether TS played a role, and informed Hildebrand he was thinking about getting a lawyer.  Bell Depo. at 79-80 (Pl.'s Supp. Exhibit 9).

Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.  The Title VII provision at issue -- the "participation clause" -- makes it unlawful for employers to retaliate against an employee because he "participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3 (emphasis added).  "Once plaintiff, acting for himself or a representative, initiates pre-complaint contact with an EEO counselor . . . he is participating in a Title VII proceeding."  Gonzalez v. Bolger, 486 F. Supp. 595, 601 (D.D.C. 1980), aff'd, 656 F.2d 899 (D.C. Cir. 1981); see also Eastland v. Tennessee Valley Authority, 704 F.2d 613, 627 (11th Cir. 1983) (describing protected activity simply as "contacting an EEO officer"); Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir. 1997) (reasoning that meeting with EEO counselor even without alleging discrimination constitutes protected activity under the participation clause, because that clause and the opposition clause serve distinct functions).  But see Brower v. Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999) (holding that "factual allegations of discrimination against a member of protected group and the beginning of a proceeding or investigation under Title VII" are required to qualify meeting with EEO counselor as protected activity).[16]  Indeed, an employer may be most tempted to act to

---

[16]  The cases cited by defendant are inapposite because they address only the meaning of "initiate contact" with an EEO counselor for the purpose of satisfying the requirement to exhaust administrative remedies under 29 C.F.R. § 1614.105(a).  See Pauling, 960 F. Supp. at 803; Pueschel, 185 F. Supp. 2d at 570.  They do not address the separate and distinct issue of the meaning of the participation clause in the context of a retaliation claim under 42 U.S.C. § 2000e-3(a).

dissuade an employee who is only considering pursuing a claim of discrimination because such early efforts could prove most successful.  It would be contrary to the intent of the participation clause to excuse retaliatory actions in that setting.

Here, based on plaintiff's deposition and declaration, a reasonable trier of fact could conclude that plaintiff attempted to explore the issue of disability discrimination with the EEO counselor, was discouraged by the EEO counselor from alleging discrimination, and followed the counselor's suggestion of initially pursuing his grievances with Hildebrand instead of pursuing an immediate EEO claim.  That initial involvement in the EEO process, the Court concludes, is statutorily protected activity under the broad language of the participation clause ("participated in any manner").  Accordingly, summary judgment on this ground is inappropriate.

### C.    Adverse Employment Action

Defendants also seek summary judgment on the retaliation claim on the ground that defendants have not taken an "adverse employment action" against plaintiff.  The only employment action that survives the exhaustion requirement is the lateral transfer of plaintiff from the Forensics Studio to the Field Support Subunit.[17]  This Circuit has held that a "lateral transfer" ordinarily will not constitute an adverse employment action unless it results in tangible harm:

> a plaintiff who is made to undertake or who is denied a lateral transfer -- that is, one in which she suffers no diminution in pay or benefits -- does not suffer an

---

[17]  The other actions alleged in the amended complaint (¶¶ 23-29) would not constitute an adverse employment action in any event.  See Stewart, 275 F.3d at 1132-33 (offensive language, false accusations, unfair blame, criticisms, or reprimands are not actionable in the absence of negative employment consequences); Forkkio v. Powell, 306 F.3d 1127, 1131-32 (D.C. Cir. 2002) (exclusion from management meetings and other communications are not adverse employment actions).

> actionable injury unless there are some other materially adverse consequences
> affecting the terms, conditions, or privileges of her employment or her future
> employment opportunities such that a reasonable trier of fact could conclude that
> the plaintiff has suffered <u>objectively tangible harm</u>.  Mere idiosyncracies of
> personal preference are not sufficient to state an injury.

<u>Brown v. Brody</u>, 199 F.3d 446, 457 (D.C. Cir. 1999) (emphasis added).  Thus, in <u>Brown</u> the

court held that the plaintiff failed to state a prima facie case where she was transferred to an

undesirable position -- a "less prestigious backshop area" where she had "little to learn" -- but

retained the same rank and salary.  <u>Id.</u> at 449, 457.  Defendants assert that plaintiff's lateral

transfer is not actionable under these standards, pointing out that, like the plaintiff in <u>Brown</u>,

plaintiff retained the same rank and salary, and that plaintiff's primary objection is that he was

unable to do the type of work he subjectively preferred -- field photography, rather than

photographic equipment maintenance.

Plaintiff argues that the lateral transfer is adverse because it resulted in objectively

tangible harm in two ways.  First, he was assigned to different duties on a substantially lower

level of responsibility, which allegedly placed him at risk of losing his GS-13 grade and position

designation and was detrimental to promotional opportunities.  In his new position, plaintiff's

primary duties consisted of camera cleaning and taking inventory, which precluded him from

maintaining his photographic skills and diminished opportunities to teach and supervise others.

Plaintiff relies on the March 22, 2002 Sparks memorandum implementing a rotational policy

between subunits as recognizing the substantially different duties in each of the subunits.  <u>See</u>

Pl.'s Exhibit 35 (stating that the Forensic Studio and Field Support subunits were "not given the

same opportunity to maintain photography skills described in their performance standards").

Second, plaintiff asserts that the reassignment resulted in loss of pay because it deprived him of

-28-

opportunities to work paid overtime that were regularly available in the Forensics Studio, but not in the Field Support Subunit.

In determining whether this transfer constitutes an adverse employment action, the Court focuses its inquiry on whether the transfer resulted in an "objectively tangible harm."  A change in responsibilities, standing alone, does not render the transfer action "adverse" within the meaning of the statute.  The law in this Circuit is well-settled that "purely subjective injuries, such as dissatisfaction with a reassignment" are not adverse employment actions.  See Forkkio, 306 F.3d at 1131.  Rather, the plaintiff must demonstrate both a significant change in responsibilities and objectively tangible harm.  Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1157 (D.C. Cir. 1997) ("changes in assignments and work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes").

Plaintiff contends that lost promotion opportunities constitute such tangible harm.  Although that may be a correct general statement of the law, plaintiff has not identified any factual evidence indicating that he either sought or was denied a promotion as a result of his transfer.  Nor has he come forward with evidence indicating that this transfer would render him ineligible for future promotions.  See James v. Booz-Allen & Hamilton, 368 F.3d 371, 377 (4th Cir. 2004) ("speculation about the future adverse consequences of [an employee's] reassignment may not rise to the level of a genuine dispute" where there is "guesswork and conjecture as to what his [promotion] prospects would have been").

Whether the lost opportunity for paid overtime work constitutes a tangible harm presents a closer question.  This Circuit has not addressed whether a transfer resulting in the lost

opportunity to work paid overtime is actionable.  However, the denial of a discretionary

monetary bonus, even where the amount is not substantial, could be considered an adverse

employment action.  See Russell v. Principi, 257 F.3d 815, 819 (D.C. Cir. 2001) (finding denial

of a $548 monetary bonus associated with performance rating a cognizable employment action).

Overtime pay is analogous to a monetary performance-based bonus, in the sense that it is not a

part of an employee's salary and benefits package (and thus there is no reasonable expectation of

entitlement to that pay), but it is clearly a tangible monetary advantage to those who are assigned

overtime work.  Thus, there is precedent for the proposition that a lateral transfer resulting in the

lost opportunity to earn overtime pay is an adverse employment action.  Gasser v. Ramsey, 125

F. Supp. 2d 1, 5 (D.D.C. 2000), on appeal, No. 04-7018 (D.C. Cir. filed Feb. 19, 2004).

However, in contrast to a performance-based monetary bonus, working overtime for

supplementary pay is not universally regarded as desirable.  Imposition of a requirement to work

overtime against the wishes of an employee, even for pay, also has been recognized as an adverse

employment action.  See Dickerson v. SecTek, Inc., 238 F. Supp. 2d 66, 76-77 & n.5 (D.D.C.

2002) ("An employer's unforeseen mandate that an employee work overtime whenever the

employer requires it could affect the 'terms, conditions, or privileges' of employment, and thus

could be described as adverse employment action") (citations omitted).  Courts have accordingly

considered whether the plaintiff sought overtime as one factor to determine whether the alleged

lost opportunity for overtime pay should be considered an adverse employment action.  See

Mannie v. Potter, 394 F.3d 977, 983-84 (7th Cir. 2005); Pleasants v. Allbaugh, 285 F. Supp. 2d

53, 56 (D.D.C. 2003).  Therefore, although Russell v. Principi suggests that the denial of a

discretionary monetary bonus -- which this Court construes to include the denial of an

opportunity for overtime pay -- can be an adverse employment action, the fact that paid overtime work may be either desirable or undesirable, depending on the plaintiff's personal preferences, warrants a further refinement in the context of overtime.  The Court concludes that a lost opportunity for overtime (assuming plaintiff has proven there were opportunities to work overtime) is only an adverse employment action where the trier of fact could reasonably conclude that plaintiff in the past sought opportunities for overtime pay or it was otherwise known to defendant that plaintiff desired such opportunities.

Here, defendants argue that plaintiff has failed to come forward with sufficient evidence showing that he has actually lost opportunities for overtime.[18]  Plaintiff's declaration and deposition testimony, however, provide evidence from which a trier of fact could reasonably conclude that defendants were aware of plaintiff's desire to work overtime (based on his prior history of working significant amounts of overtime), and that plaintiff would have had more opportunities to work overtime in the Forensics Studio than in the Field Support Subunit.

Plaintiff has come forward with evidence showing that substantially more overtime pay was available to S&T photographers in the Forensics Studio on average than to plaintiff in his reassigned status, as shown in the table below (with figures rounded to the nearest dollar).

------

[18]  Defendants also argue in passing that the lost overtime alleged by plaintiff was nominal and thus nonactionable.  However, Russell recognized that employment actions resulting in loss of income in amounts less than at issue here are actionable.  Russell, 257 F.3d at 819; cf. Dickerson, 238 F. Supp. 2d at 76 n.4 (suggesting in dicta that a de minimis loss of overtime pay would not be an adverse employment action).

| Calendar Year[19] | Plaintiff | Forensics Studio S&T Photographers |
|---|---|---|
| 2001 (non-travel overtime) | 0 | $973 |
| 2002 | $350 | $2,233 |
| 2003 | $254 | $753 |

Bell Decl. ¶¶ 36-37 (Pl.'s Exhibit 5).  The difference between plaintiff's overtime earnings over

the three-year period and the Forensics Studio average for the same period is $3,355.  Although

plaintiff has not pointed to specific instances in which overtime was requested and denied, the

evidence produced is sufficient to create a genuine issue of material fact as to whether the

transfer placed plaintiff in a situation where he had substantially fewer opportunities to earn

overtime income and thus suffered an objectively tangible harm.  Because the trier of fact thus

must resolve whether the evidence ultimately supports finding the transfer to be an adverse

employment action, summary judgment for the defendants on this basis is not warranted.

D.      Causation

Defendants next argue that summary judgment is nonetheless warranted on the ground

that there is no causal connection between plaintiff's August 25, 2000 meeting with the EEO

counselor and the reassignment of plaintiff to the Field Support Subunit.  Defendants cite the

deposition testimony of Varounis (who made the reassignment decision) and Feyerherm

(plaintiff's first-line supervisor) as establishing that Varounis alone made the decision to transfer

---

[19]  Plaintiff states that he provides no data on the year 2000 because, for budgetary
reasons, overtime was being discouraged and compensatory time was being used instead of
overtime pay whenever possible.  Bell Decl. ¶ 35 (Pl.'s Exhibit 5).  With respect to the year 2001,
plaintiff agrees that only non-travel overtime should be considered because plaintiff was in an
official travel-restricted status due to the OPR investigation.

plaintiff, and that she was not aware of plaintiff's meeting with the EEO counselor until after the reassignment decision had been made.  In the absence of such knowledge, a retaliatory animus could not have motivated the decision.

Plaintiff raises a genuine issue of material fact as to whether Varounis had knowledge of the EEO meeting prior to the reassignment.  As previously noted, plaintiff met with Hildebrand on September 5, 2000, to discuss his complaints regarding Feyerherm and disclosed that he had met with an EEO counselor about the issue.  Hildebrand has stated that although he is unable to recall the date or details of the meeting, it is "more than likely" that he would have spoken to Varounis about the substance of his meeting with plaintiff to provide her information she would need in order to manage the SPU.  See Hildebrand Depo. at 12-14 (Pl.'s Exhibit 23).  Plaintiff has also pointed to various pieces of evidence raising issues regarding the credibility of Varounis' deposition testimony.  Because there are genuine issues of material fact, summary judgment on this ground is inappropriate.

### E.    Defendants' Proffered Legitimate Non-Discriminatory Reason

Finally, defendants argue that, even if plaintiff has established a prima facie case of retaliation, summary judgment is warranted because the FBI has come forward with legitimate, non-discriminatory reasons for reassigning him.  Defendants point to evidence indicating that Varounis reassigned plaintiff for two reasons:  first, plaintiff was unhappy working for Feyerherm, and she believed the reassignment presented an opportunity "to make an employee happy" as well as to enhance the ability of the unit to "operate effectively and efficiently," and second, there was a need for another staff person to work in the Field Support Subunit because of the backlog in camera repair and cleaning.  Varounis Depo. at 76, 78-79 (Pls.' Exhibit 19).

Varounis also believed the reassignment would be a benefit to plaintiff because it would give him a chance to further develop his interest in digital photography. Defs.' Statement of Material Facts at 11; Varounis Depo. at 76.

However, plaintiff has come forward with evidence discrediting these reasons. First, many photographers under Feyerherm's supervision were unhappy with his management style, and did not believe he was a satisfactory supervisor. Richard Thomas Depo. at 40-41 (Defs.' Exhibit 9); Cyrus Bowman Depo. at 21-22 (Defs.' Exhibit 8). One other photographer, Kevin Brown, described his relationship with Feyerherm as worse than Bell's. Brown Depo. at 37-38 (Pl.'s Exhibit 31) (stating Brown had the worst relationship with Feyerherm). Yet plaintiff alone was singled out for the transfer to another subunit. There is also an issue regarding the credibility of Varounis' statements that she believed plaintiff wanted to leave the Forensics Studio. Plaintiff denies that he stated that he requested a transfer.[20] Plaintiff also reacted unhappily to the news of reassignment, and the EEO complaint itself made clear plaintiff considered the reassignment undesirable.

There is likewise a genuine issue of material fact as to whether plaintiff's reassignment was needed to deal with the manpower shortage in the Field Support Subunit. On or about August 24, 2000, the SPU posted a vacancy announcement for an S&T Photographer to fill the position left by another departing S&T photographer. See Announcement No. 00-LD-36 and Department of Justice Final Agency Decision (Pl.'s Exhibit 25). The application period for the announcement closed on September 14, 2000, and a career board was about to convene to

---

[20] Plaintiff states he has no recollection of telling Varounis that he "hated" Feyerherm (Bell Decl. ¶ 25, Pl.'s Exhibit 5), but acknowledges in his brief that it is possible he made those statements but cannot remember them due to TS.

identify the most qualified applicant for the job.  Id.   While that hiring decision was in process,

Varounis made the decision to reassign plaintiff.  Approximately one month after Varounis

informed plaintiff of his reassignment to the Field Support Subunit, she selected a new hire for

the Forensics Studio.  Id.  Based on such evidence, a reasonable trier of fact could conclude that

Varounis' explanation that plaintiff's transfer was necessary to deal with the manpower shortage

in the Field Support Subunit lacks credibility because the new hire could simply have been

assigned there if plaintiff had remained in the Forensics Studio.

Finally, there are genuine issues of material fact regarding whether Varounis reassigned

plaintiff to give him a chance to develop his interest in digital photography.  Plaintiff has come

forward with evidence indicating that, at the time of the reassignment, the Forensics Studio was

responsible for digital photography, while the Field Support Subunit duties related to digital

photography were exclusively concerned with setting up and installing digital darkrooms.  Sparks

Depo. at 26-27 (Pl.'s Exhibit 27).  Plaintiff also has testified that no work related to digital

darkrooms was assigned to him.

Thus, plaintiff has come forward with evidence that a reasonable jury could find

discredits defendants' proffered nondiscriminatory reasons for the transfer.  Moreover, the Court

has determined, based on a review of all of the evidence, that a reasonably jury could conclude

that the adverse employment action was motivated by a retaliatory reason.

## CONCLUSION

For the foregoing reasons, the Court holds that plaintiff's claims of disability

discrimination fail as a matter of law.  Accordingly, the Court grants defendants' motion for

summary judgment on Count I of the amended complaint, and denies plaintiff's motion for partial

summary judgment on Count I.  The Court denies defendants' motion for summary judgment on the retaliation claim because there are genuine issues of material fact to be determined by the trier of fact.

_____/s/_____
JOHN D. BATES
United States District Judge

Signed this <u>25th</u> day of March, 2005.